UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS- DIVISION

| | |
|---|---|
| OXFORD FINANCIAL GROUP, LTD. an Indiana corporation,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN W. DYKSTRA , an individual, and JACOB R. WATSON, an individual,<br><br>Defendants. | Case No. 1:21-cv-701 |

## COMPLAINT

Plaintiff, Oxford Financial Group, LTD.™ ("Oxford"), for its Complaint against Defendants Brian W. Dykstra ("B. Dykstra") and Jacob R. Watson ("J. Watson" and together with B. Dykstra "Defendants"), states as follows:

## INTRODUCTION

1. This lawsuit arises out of Defendants' willful breach of the contractual obligations they owe to Oxford by secretly planning their departure to work for Strategies Wealth Advisors ("SWA"), a direct competitor in the highly competitive business of financial planning and wealth management. On March 15, 2021, Defendants submitted letters of resignation to Oxford claiming that they would honor the restrictions in their respective employment agreements. Despite taking employment with SWA just seven miles away, Defendants claimed they would not be working in a "competitive" capacity or within the "Restricted Geographic Area."[1] However, the employment agreements at issue prohibit Defendants from working for a direct competitor such as SWA in the financial planning, wealth advisory and/or investment management business.  The restrictive covenants are reasonable as to duration (12 months) and geographic scope (50-mile radius), and enforceable under Indiana law,

---

[1] All defined terms herein shall have the same meaning ascribed to them in the respective employment agreements.

which is specified as controlling pursuant to the employment agreements. By violating the restrictive covenants, Oxford is entitled to injunctive relief, liquidated damages, actual damages and attorneys' fees under Defendants' respective employment agreements.

## PARTIES, JURISDICTION AND VENUE

2.  Oxford Financial Group, LTD, is an Indiana corporation whose principal place of business is located in Carmel, Indiana. Oxford has a satellite office in Grand Rapids, Michigan where Defendants were employed. Oxford is a citizen of Indiana for diversity purposes.

3.  Defendant, B. Dykstra, was one of the Managing Directors with Oxford whose last known address is 942 Timber Winds Dr. SW, Grand Rapids, Michigan 49534. Mr. Dykstra is a citizen of Michigan for diversity purposes.

4.  Defendant, J. Watson, was a Financial Advisor with Oxford whose last known address is 2357 Mary Beth Lane, Hudsonville, Michigan 49426. Mr. Watson is a citizen of Michigan for diversity purposes.

5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a), because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. This Court is a proper venue for this action under 28 U.S.C. § 1391(a).

6.  For injunctive relief, the amount in controversy is measured by the value of the object of the litigation. In this case, Oxford is seeking to protect its client base while enforcing non-competition covenants. Defendant Dykstra oversaw $349 million in assets while at Oxford and Defendant Watson is the primary contact for a client portfolio valued in excess of $2 billion. This value alone meets the jurisdictional threshold.

7. In addition, attorneys' fees may be included in the determination of whether the amount in controversy exceeds $75,000 and both Defendants are subject to attorneys' fees under their employment agreement(s). As such, this Court has subject matter jurisdiction.

8. Personal jurisdiction exists, both by virtue of Defendants expressly consenting to the jurisdiction of this Court in their employment agreements, and because of their extensive contacts with Indiana-based Oxford as a Managing Director and Client Relationship Strategist.

9. Venue and jurisdiction are also proper pursuant to the employment agreements signed by Defendants which mandate jurisdiction and venue in Hamilton County, Indiana or the United States District Court for the Southern District of Indiana, Indianapolis Division.

## **FACTUAL ALLEGATIONS**

### A. **Oxford's Wealth Management Team is made up of highly trained and uniquely skilled employees.**

10. Oxford is a full service financial advisory firm that provides wealth management, trust administration, retail and institutional investment services. Oxford is one of the largest Registered Investment Advisory (RIA) firms in the country, with oversight of more than $26 billion in assets under advisement (which includes assets under management) for over 700 families and institutions in 37 states. Oxford has provided families and institutions generational estate planning advice and forward-thinking investment strategies for over 30 years. Oxford's close relationship with its client base is essential to its on-going business.

11. Part of Oxford's strategy in the highly competitive wealth management business is to hire and train individuals who believe in creating life-long relationships with their clients. This strategy is dependent upon understanding the specific needs of individual clients thereby cultivating long-lasting relationships.

12. Oxford has expended, and continues to expend, considerable time, money and resources identifying, developing and maintaining qualified individuals with the necessary skills and abilities to provide the types of services Oxford provides to its clients.

13. In order to cultivate and maintain highly trained and uniquely skilled employees and in order to maintain its confidential and competitive information, including work strategies, employee information, and customer names and information, employees of Oxford are required to sign employment agreements that contain, among other things, restrictive covenants against competition and solicitation of clients and employees.

14. Employees working within Oxford and in particular, senior level employees, are entrusted with confidential and proprietary information of Oxford, including but not limited to financial records, business plans, financial plans, client lists, marketing and sales strategies, pricing lists, fee schedules, wealth management plans and any other confidential information gained by the employees during the term of their employment (collectively the "Proprietary Information").

15. By signing an employment agreement, each employee acknowledges their obligations and restrictive covenants for which they are bound both during employment and after separation from employment.

**B.   As Managing Director, B. Dykstra owed statutory and common law fiduciary duties to Oxford as well as post-employment contractual duties.**

16. B. Dykstra, CFP®, CIMA®, joined Oxford on or about January 20, 2014 to assume a Managing Director role which has seniority in the firm, in Oxford's Grand Rapids, Michigan location.

17. During his tenure with Oxford, B. Dykstra served as Managing Director, and was an equity owner within the company. He had access to Proprietary Information of Oxford that would not be publically available to competitors interested in soliciting clients of Oxford.

18. B. Dysktra developed and grew his book of business while working for Oxford. At the time of his resignation, he had assets under management or AUM of $349 million.

4

19. On January 20, 2013, B. Dykstra entered into that certain Employment, Non-Disclosure and Non-Competition Agreement with Oxford (the "B. Dykstra Agreement"). A copy of the B. Dykstra Agreement is attached as <u>Exhibit A</u>.

20. The B. Dykstra Agreement contains a restrictive covenant which, among other things, prohibits him from: (i) engaging in any "Competitive Business" with Oxford for a period of twelve (12) months following his resignation within 50 miles of any Oxford office; (ii) selling, marketing or endeavoring to sell or market any "Competitive Services/Products" to any client of Oxford for the purpose of inducing the client to use a financial planner other than Oxford for a period of eighteen (18) months following his resignation; and (iii) hiring or soliciting for hire any then-current employees of Oxford or to contact them for the purpose of leaving Oxford for a period of twelve (12) months following his resignation.

21. B. Dykstra had both a common law and contractual duty to keep all company information confidential and to only use such information in the ordinary course of business.

22. In addition, B. Dykstra owed common law and statutory fiduciary duties to Oxford under Indiana law.

23. The B. Dykstra Agreement is narrowly tailored to protect a competitive business interest of Oxford and is necessary to prevent the unlawful dissemination of Oxford's Proprietary Information.

24. B. Dykstra resigned from his employment with Oxford on March 15, 2021, thus his post-employment obligations run until March 15, 2022 (12 months) and September 15, 2022 (18 months) respectively.

      **C.**     **As a Client Relationship Strategist, J. Watson owed post-employment contractual and fiduciary duties to Oxford.**

25. On October 11, 2019, J. Watson, CFP® entered into an Employment, Non-Disclosure and Non-Competition Agreement with Oxford (the "J. Watson Agreement"). A copy of the J. Watson Agreement is attached as <u>Exhibit B</u>.

26. J. Watson was a Client Relationship Strategist specializing in investment management, investment strategies and solutions development for Oxford clients. Oxford employed J. Watson from February 14, 2005 until March 15, 2021.

27. During that time, he served as a key contact for client relationships and had access to Oxford's Proprietary Information. J. Watson was the primary contact with several institutional clients and some of the largest clients of Oxford. In total, the clients he worked with had an AUM of $2.1 billion.

28. As a Client Relationship Strategist, J. Watson had responsibility over significant group assets and had access to confidential client information, work processes and techniques, financial plans, asset allocations and other matters that would not be publically available to competitors interested in soliciting clients of Oxford.

29. The J. Watson Agreement contains a restrictive covenant which, among other things, prohibits him from: (i) engaging in any "Competitive Business" with Oxford for a period of twelve (12) months following his resignation within 50 miles of any Oxford office; (ii) selling, marketing or endeavoring to sell or market any "Competitive Services/Products" to any client of Oxford for the purpose of inducing the client to use a financial planner other than Oxford for a period of eighteen (18) months following his resignation; and (iii) hiring or soliciting for hire any then-current employees of Oxford or to contact them for the purpose of leaving Oxford for a period of twelve (12) months following his resignation.

30. J. Watson had access to Proprietary Information of Oxford through his position of trust including, without limitation, personal information about client brokerage accounts, financial plans and investment strategies.

31. J. Watson had both a common law and contractual duty to keep all company information confidential and to only use such information in the ordinary course of business.

32. In addition, J. Watson owed common law and statutory fiduciary duties to Oxford under Indiana law.

33. The J. Watson Agreement is narrowly tailored to protect a competitive business interest of Oxford and is necessary to prevent the unlawful dissemination of Oxford's confidential and proprietary information.

34. J. Watson resigned from his employment with Oxford on March 15, 2021, thus his post-employment obligations run until March 15, 2022 (12 months) and September 15, 2022 (18 months) respectively.

35. SWA is an independent wealth management firm located at 3333 Grand Ridge Drive NE, Grand Rapids, Michigan 49525. SWA is a direct competitor of Oxford and provides essentially the same services as Oxford. By taking employment with a direct competitor just seven miles from Oxford's Grand Rapids office, Defendants are in violation of their employment agreements.

**COUNT I – BREACH OF CONTRACT**
**(Defendant B. Dykstra)**

36. Oxford incorporates by reference the preceding paragraphs of its Complaint as if fully set forth herein.

37. The B. Dykstra Agreement contains restrictive covenants which, among other things, prohibit him from: (i) engaging in any "Competitive Business" within the "Restricted Geographic Area" for a period of twelve (12) months following his resignation; (ii) selling, marketing or endeavoring to sell or market any "Competitive Services/Products" to any client of Oxford for the

7

purpose of inducing the client to use a financial planner other than Oxford for a period of eighteen (18) months following his resignation; and (iii) hiring or soliciting for hire any then-current employees of Oxford or to contact them for the purpose of leaving Oxford for a period of twelve (12) months following his resignation.

38. B. Dykstra breached the Agreement by, among other things, taking employment with a "Competitive Business" within the Restricted Geographic Area.

39. Upon information and belief, B. Dykstra breached the Agreement by soliciting and/or recruiting employees of Oxford, while B. Dykstra was employed at Oxford, to terminate their employment relationship with Oxford.[2] Specifically, Defendants both resigned on the same day, at nearly the same time, and both went to the same competitor. In other words, Defendants violated the Agreement by cross-recruiting one another while they were employed at Oxford.

---

[2] In light of the Indiana Supreme Court's ruling in *Heraeus Medical, LLC v. Zimmer, Inc.*, 135 N.E.3d 150 (Ind. 2019), Oxford is not pursuing a breach of contract claim related to post-employment solicitation of Oxford employees. Rather, Oxford's non-solicitation breach of contract claims against Defendants are limited to solicitation of Oxford employees while Defendants were still employed, a situation not present in *Heraeus Medical, LLC*. Courts have acknowledged a legal distinction between post-employment and in-term restrictive covenants, finding the latter more reasonable and routinely enforceable. *See e.g., Harrison v. Glucose Sugar Ref. Co.*, 116 F. 304, 310 (7th Cir. 1902) (holding "no public policy could be violated" in upholding a covenant applying during the "period of service engaged for"); *Deutchland Enterprises, Ltd. v. Burger King Corp.*, 957 F.2d 449, 452 (7th Cir. 1992) (differentiating between restrictive covenant that applied only during the term of the agreement and holding greater restrictions during the term of a contract permissible); *Orthopedic Equip. Co. v. Streetman & Assocs., Inc.*, 390 So. 2d 134, 136 (Fla. Dist. Ct. App. 1980) (a restrictive covenant that "coincides with the term of employment… does not create the evils which made a post-term restraint invalid at common law."); *Major v. Orthopedic Equip. Co.*, 496 F. Supp. 604, 615 (E.D. Va. 1980) ("a restriction during the term of the employment, not after, [] should be given greater latitude than a restraint in the latter case."); *Good v. Modern Globe, Inc.*, 78 N.W.2d 199, 204 (Mich. 1956) (In-term non-compete is "a provision which any employer would certainly have a right to contract for from any employee for the duration of his employment."); *Vendo Co. v. Stoner*, 245 N.E.2d 263, 281-86 (Ill. App. Ct. 1969) (recognizing an "exception" to otherwise overly broad covenants "where the restraint lasts during the contractual relationship of the parties" and holding it was irrelevant "that the post-term aspects of the covenant might, if standing alone, be unnecessarily broad" because the issue in that case involved conduct during employment and the restrictive covenant was therefore valid and enforceable); *AlterG, Inc. v. Boost Treadmills LLC*, No. 18-CV-07568-EMC, 2019 WL 4221599, at *10 (N.D. Cal. Sept. 5, 2019) ("Defendants are correct that *post*-employment non-compete provisions are generally unenforceable under California law…But that rule has no relevance here, because [plaintiff] alleges only that employment agreement barred Allen and Bean from competing with [plaintiff] *during* their employment with [plaintiff]."); *Loughlin v. Ventraq, Inc.*, No. 10-CV-2624-IEG BGS, 2011 WL 1303641, at *4 (S.D. Cal. Apr. 5, 2011) (California's fundamental state policy of prohibiting post-employment noncompete agreements not implicated where agreement applied to conduct during the course of employment).

40. As a direct and proximate result of B. Dykstra's breach, Oxford has been and will continue to be damaged.

41. Pursuant to the B. Dykstra Agreement, Oxford is entitled to injunctive relief, and the recovery of its attorneys' fees and expenses in the enforcement of the B. Dykstra Agreement.

WHEREFORE, Oxford respectfully requests this Court enter a judgment in favor of Oxford and against B. Dykstra, enjoin B. Dykstra from breaching the B. Dykstra Agreement, award Oxford its damages, pre- and post-judgment interest, costs and attorneys' fees pursuant to the B. Dykstra Agreement, and grant Oxford such further relief this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT
### (Defendant J. Watson)

42. Oxford incorporates by reference the preceding paragraphs of its Complaint as if fully set forth herein.

43. The J. Watson Agreement contains restrictive covenants which, among other things, prohibit him from: (i) engaging in any "Competitive Business" within the "Restricted Geographic Area" for a period of twelve (12) months following his resignation; (ii) selling, marketing or endeavoring to sell or market any "Competitive Services/Products" to any client of Oxford for the purpose of inducing the client to use a financial planner other than Oxford for a period of eighteen (18) months following his resignation; and (iii) hiring or soliciting for hire any then-current employees of Oxford or to contact them for the purpose of leaving Oxford for a period of twelve (12) months following his resignation.

44. J. Watson has breached the Agreement by, among other things, taking employment with a "Competitive Business" within the Restricted Geographic Area.

45. Upon information and belief, J. Watson breached the Agreement by soliciting and/or recruiting employees of Oxford, while J. Watson was employed at Oxford, to terminate their employment relationship with Oxford. Specifically, Defendants both resigned on the same day, at

nearly the same time, and both went to the same competitor. In other words, Defendants violated the Agreement by cross-recruiting one another while they were employed at Oxford.

46. As a direct and proximate result of J. Watson's breach, Oxford has been and will continue to be damaged.

47. Pursuant to the J. Watson Agreement, Oxford is entitled to injunctive relief, and the recovery of its attorneys' fees and expenses in the enforcement of the B. Dykstra Agreement.

WHEREFORE, Oxford respectfully requests this Court enter a judgment in favor of Oxford and against J. Watson, enjoin J. Watson from breaching the J. Watson Agreement, award Oxford its damages, pre- and post-judgment interest, costs and attorneys' fees, and grant Oxford such further relief this Court deems just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (All Defendants)

48. Oxford incorporates by reference the preceding paragraphs of its Complaint as if fully set forth herein.

49. As a Managing Director of Oxford's Grand Rapids, Michigan office, B. Dykstra was placed in a position of trust and confidence, and had a fiduciary duty to maintain the confidentiality of Oxford's Proprietary Information.

50. As a senior level employee of Oxford, J. Watson was placed in a position of trust and confidence, and had a fiduciary duty to maintain the confidentiality of Oxford's Proprietary Information.

51. Defendants owe statutory, common law and contractual fiduciary duties to Oxford. Indiana statutes impose mandatory fiduciary duties of good faith and loyalty and impose individual liability for breach.

52. Defendants had a fiduciary duty not to divert or usurp business opportunities for their own personal gain during the course of their employment with Oxford.

53. Based on the timing of their departure and the fact that both Defendants went to work for SWA, a direct competitor of Oxford, Defendants necessarily colluded with one another and induced one another to violate the restrictive covenants contained in their respective employment agreements.

54. By the conduct described above, Defendants have violated their fiduciary duty of loyalty.

55. Defendants' conduct has caused, and will continue to cause Oxford substantial and irreparable damage.

WHEREFORE, Oxford respectfully requests this Court enter a judgment in favor of Oxford and against Defendants, enjoin Defendants from causing the breach of his employment agreement, award Oxford its damages, pre- and post-judgment interest, costs and attorneys' fees, and grant Oxford such further relief this Court deems just and proper.

## COUNT IV – INJUNCTIVE RELIEF
### (All Defendants)

56. Oxford incorporates by reference the preceding paragraphs of its Complaint as if fully set forth herein.

57. B. Dykstra and J. Watson were aware at all times that their employment agreements provided for injunctive relief in favor of Oxford to enforce its rights in the event of a breach or threatened breach by Defendants.

58. Similarly, Defendants were acutely aware of their post-employment obligations as evidenced by their resignation letters and assurances that they would refrain from engaging in a competitive business with Oxford.

59. As set forth above, Defendants knowingly and willfully breached their employment agreements by, among other things, taking employment with a Competitive Business well within a Restricted Geographic Area, as those terms are defined in the employment agreements.

60. Upon information and belief, Defendants will continue to disregard and breach and facilitate the breach of the common law and contractual duties owed to Oxford.

61. Based on Defendants' long tenure with Oxford and access to Oxford's Proprietary Information, Oxford reasonably believes that it is inevitable that Defendants will disclose Oxford's Proprietary Information.

62. Oxford has suffered, and will continue to suffer immediate and irreparable injury unless Defendants and all of their agents, servants and employees and those acting in concert with them are enjoined from violating their contractual, statutory and common law non-disclosure obligations (where applicable) by violating their post-employment obligations.

63. As a result of Defendants' malicious conduct, Oxford has suffered and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law.

64. Oxford has clean hands and a substantial likelihood of succeeding on the merits of this case.

65. No adequate remedy at law exists for Oxford since monetary damages will not completely compensate Oxford.

66. The harm to Oxford substantially outweighs any harm to Defendants if injunctive relief is not issued.

67. Defendants, on the other hand, will suffer no harm by simply being ordered to abide by the terms of their respective agreements which they knowingly and voluntarily signed.

68. The public interest will be served by enjoining and restraining Defendants' unlawful and improper conduct.

WHEREFORE, Oxford requests entry of judgment in its favor and against Defendants, jointly and severally, and further requests that this honorable Court:

(a) preliminarily and permanently enjoin, restrain and prohibit Defendants from: (i) directly or indirectly violating their respective legal obligations owed to Oxford, including, without limitation, working for a direct competitor in violation of Defendants' respective employment agreements; (ii) disclosing and misusing Proprietary Information of Oxford; (iii) soliciting clients or employees of Oxford;

(b) declare that Defendants have violated their contractual and legal obligations to Oxford;

(c) award Oxford such damages as may be proven at trial, including without limitation, compensatory and exemplary damages, plus interests and costs;

(d) award Oxford its attorneys' fees and costs incurred in prosecuting this action; and

(e) award such other and further relief as this honorable Court deems just and equitable.

Dated: March 23, 2021

Respectfully submitted,

OXFORD FINANCIAL GROUP, LTD

By its Attorneys,

*/s/John R. Maley*
John R. Maley (14300-89)
Hannesson Murphy (25993-49)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Email: jmaley@btlaw.com
          hmurphy@btlaw.com

## **CERTIFICATE OF SERVICE**

This filing is being served this 23rd day of March, 2021 by personal service on each of the individual Defendants as follows:

Brian W. Dykstra
942 Timber Winds Dr. SW
Grand Rapids, Michigan 49534

Jacob R. Watson
2357 Mary Beth Lane
Hudsonville, Michigan 49426

    *s/John R. Maley*
John R. Maley

14